[No. B019341. Second Dist., Div. Five. Apr. 7, 1986.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
BETTIE KATHLINE SMART, Real Party in Interest.

COUNSEL

Ira Reiner, District Attorney, Donald J. Kaplan and Brent Riggs, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

M. Lynn Huston for Real Party in Interest.

OPINION

HASTINGS, J.—The People seek a writ of mandate to compel the superior court to reinstate a charge of murder dismissed pursuant to Penal Code section 995. We agree that the murder charge was improperly dismissed.

Defendant/real party Kathline Smart was charged with the murder of her infant son, Matthew Smart. She was also charged with felonious child abuse (Pen. Code, § 273a, subd. (1)). After a preliminary hearing, the magistrate found that there was insufficient evidence to hold defendant to answer on the murder charge. Defendant was held to answer on charges of voluntary manslaughter (Pen. Code, § 192, subd. (a)) and felony child abuse.

The People thereafter filed an information in superior court charging defendant with murder and felony child abuse. The court granted defendant's motion to set aside count I of the information (murder) in favor of a charge of manslaughter.

The People filed an appeal from the order setting aside count I of the information (Pen. Code, § 1238, subd. (a)(1); *People* v. *Fraijo* (1977) 78 Cal.App.3d 977, 980-981 [144 Cal.Rptr. 424]) but also filed the within petition contending that appeal was an inadequate remedy. We have determined that to avoid any delay in defendant's trial (or a retrial, should the People prevail on appeal), a peremptory writ of mandate is appropriate in this case.

FACTS

The facts adduced at the preliminary hearing were as follows:

During the latter part of August 1985, defendant was separated from her husband, Timothy Smart. The couple's 12-month-old son, Matthew, lived with defendant. Some time during the latter part of August or early part of

September 1985, defendant was notified that she was being evicted from her apartment.

On September 27, 1985, John Iskades saw defendant and Matthew sitting in front of a liquor store. Defendant asked Iskades for a ride and he obliged. Defendant told Iskades that Matthew had neither eaten nor been changed all day, so he stopped at another store to buy some diapers. While he was in the store, defendant drove off in the pickup truck.

About three days later, defendant (without Matthew) moved her belongings out of her apartment. On the same day or shortly thereafter (September 30), defendant received a traffic citation while driving the pickup. The officer who issued the citation noticed that "there was property stacked on the seat of the vehicle on the floorboards from right next to her all the way to the other door almost to the ceiling of the cab of the truck." There was also property in the truck bed. Matthew was not in the truck and defendant did not mention a missing child.

Three days later, on October 2, defendant, driving the still-loaded pickup, nearly collided with a police car while making a left turn. Defendant then led the police officers on a chase which four other police units eventually joined. Defendant was finally apprehended after she collided with another vehicle. Defendant was arrested and the pickup was taken to an impound yard. Once again, defendant failed to mention a child.

On October 4, Iskades was notified he could pick up his truck at the tow yard. Iskades went to retrieve his belongings from the truck. On the driver's floorboard, beneath a cushion and wrapped in wet newspaper, Iskades found a "survival" knife which he had kept in the glovebox but had never used. There was a substance on the knife which he described in appearance as "if you took a cookie and dipped it in milk and let it sit there and soak." Iskades wiped off the knife, but ultimately turned it over to detectives. Traces of blood were found on the knife.

Detective Gurbada went to inspect the truck on October 8. By that time, the truck was emitting "the distinct odor of decomposition." The detective testified that the "inside cab portion was loaded from the floorboard to an area near the ceiling with assorted rubbish, bags of clothing and items of personal property, such as purses and et cetera." When the detective opened the driver's side door, "several hundred live fly larvae, white maggots, fell out onto the sidewalk by the door."

Detective Gurbada and his partner emptied the truck cab, eventually producing a pile which measured approximately eight feet long, three feet

across and "a couple of feet high." At the bottom of the pile, Gurbada found a stained pillow, under which was a stained baby blanket, which was wrapped around the decomposing body of a baby. The baby's skeletonized head had a diaper across it.

Dr. Eva Heuser of the Los Angeles County Medical Examiner's Office testified at defendant's preliminary hearing that although the exact cause of the baby's death could not be determined, there were no findings which would attribute the infant's death to natural causes. Further, the decomposition of the body was most unusual in that while the upper part of the body was almost totally decomposed and in fact the head was completely skeletonized, the lower portion of the body was relatively well preserved. Dr. Heuser testified that one would expect such accelerated decomposition where bacteria had been "preferentially introduced" by, for instance, a break in the skin, causing that part of the body to decompose faster. Although the body was too severely decomposed for the medical examiner to determine the cause of death, the accelerated decomposition of the body was consistent with a stab wound to the chest.

Dr. Heuser admitted on cross-examination that the unusual pattern of decomposition could have been caused by another factor such as a lung abscess, although in such a case the baby would have been "very ill" prior to the time of death.

## DISCUSSION

■ An information will not be set aside if there is some rational ground for assuming the *possibility* that an offense has been committed and that the accused is guilty of it. (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].) The information will be set aside only where there is no evidence that a crime has been committed or there is no evidence to connect the defendant with a crime shown to have been committed. (*People* v. *Jablon* (1957) 153 Cal.App.2d 456, 459 [314 P.2d 824].) Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information. (*People* v. *Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664].)

■ The magistrate and the respondent court concluded that no probable cause existed to support a charge of murder. This determination constituted a legal conclusion which is subject to independent review by this court. (*People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) In such a case, our function is to determine whether a person of ordinary caution or prudence would be led to believe and conscientiously

entertain a strong suspicion that the defendant committed the crime charged. (*Ibid.*)

■ Based upon our independent review of the record, we conclude that there was sufficient evidence to hold defendant to answer for murder.

Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187.) ■ In order to prove the commission of the crime of murder, each of the following elements must be proved: (1) That a human being was killed; (2) that the killing was unlawful; and (3) that the killing was done with malice aforethought. (CALJIC No. 8.10 (1983 rev.).)

■ Both the magistrate and the respondent court found that there was sufficient evidence of an unlawful killing to hold defendant to answer for manslaughter, which is an unlawful killing *without* malice. (CALJIC No. 8.37.) Contrary to the findings of the court below, however, there was ample evidence of malice to support the charge of murder.

Malice may be either express or implied. (CALJIC No. 8.11 (1983 rev.).) ■ Malice is implied "when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (*Ibid.*) ■ The evidence presented at the preliminary hearing supports the inference that at the very least the baby died as the result of such an act, and that the act was committed by the defendant.

Both the magistrate and the respondent court seized upon the fact that the cause of death could not be determined due to the unusual decomposition of the body. We do not view this as a lack of evidence, but as evidence that the child met his death in some unnatural fashion. Although the deputy medical examiner testified that the cause of death could not be determined, she also testified that (1) there were no findings which would attribute death to natural causes, (2) the unusual decomposition was attributable only to "preferentially introduced" bacteria and was consistent with a stab wound to the chest, and (3) death had occurred from four to ten days prior to discovery of the body. There was no evidence that the child was in the custody of anyone other than the defendant during this time, and in fact had been observed to be healthy while in the defendant's custody just a week before. The position of the body and the circumstances under which it was found also indicate foul play. The baby's body (with a diaper covering the face) was wrapped in a blanket and covered with a pile of debris which, when removed from the truck, made a pile three feet across, eight feet long,

and two feet high.[1] At the very least, such evidence indicates a willful neglect on defendant's part which would give rise to a charge of murder.

The most logical inference to be drawn from the evidence, however, is that defendant killed the baby and buried the body under a pile of debris. Certainly this is an inference which a reasonable person could draw from the evidence. The refusal of the magistrate to hold defendant to answer for murder, and the respondent court's granting of the motion to dismiss with respect to the murder count, were both based upon the fortuitous (for the defendant) circumstance that the baby's body had decomposed to such a state that the exact cause of death could not be determined. However, the evidence of a homicide, while circumstantial, was certainly sufficient to hold defendant to answer on a charge of murder.

Let a peremptory writ of mandate issue directing the respondent court to vacate its order of January 6, 1986, granting defendant's motion to dismiss (Pen. Code, § 995) as to count I only, and enter a new and different order denying said motion.

Feinerman, P. J., and Ashby, J., concurred.

---

[1]In view of this evidence, the respondent court's speculation that the baby might have been injured in the collision and "filtered down" through the debris seems naive.